# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA


| | | |
|---|---|---|
| DAVID PATRICK GRIBSCHAW, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 10 – 1106 |
| v. | ) | |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| MICHAEL WENEROWICZ, TOM | ) | |
| CORBETT, *The Attorney General of* | ) | |
| *the State of Pennsylvania*, STEPHEN | ) | |
| A. ZAPPALA, JR., *The District* | ) | |
| *Attorney of the County of Allegheny*, | ) | |
| | ) | |
| Respondents. | ) | |


## MEMORANDUM OPINION

Pending before the Court is a Petition for Writ of Habeas Corpus (hereinafter referred to as "Petition") filed by David Patrick Gribschaw, (hereinafter referred to as "Gribschaw" or "Petitioner") pursuant to 28 U.S.C. § 2254. Petitioner challenges his December 11, 2001 conviction for first degree murder and sentence to life in prison without the possibility of parole at Allegheny County Court of Common Pleas, Criminal Division CC No. 200002746. For the following reasons, the Petition will be denied.

### A.    Facts of the Crime

The facts of the crime, as set forth by Judge Cashman in his Pa. R.A.P. 1925(b) Opinion dated April 17, 2003, are as follows.

> At approximately 1:00 a.m. on December 17, 1999, Susan Hill,
> (hereinafter referred to as "Hill"), returned to her home in Glassport,
> Pennsylvania, after an evening of playing darts with several of her friends. When
> Hill returned home, she found her two sons, Gordon Carter, Jr., (hereinafter

1

referred to as "Carter"), age eighteen, and Patrick Carter, playing video games. Carter, because of his involvement with the juvenile court justice system, had been placed in a probationary program supervised by an agency referred to as The Academy. Pursuant to the terms of his probation, Carter, who was allowed to reside at home, would go to school and following the end of the school day would be picked up by representatives of The Academy and then taken to that facility until he was returned home, generally between the hours of 8:30 and 9:00 p.m. The Academy continued to monitor individuals in its program by making random phone calls to their homes to insure that they did not break curfew. These random phone calls were made until approximately 1:00 a.m.

Carter had received his random phone call prior to his mother returning on that evening and advised her of that fact. Hill went to the second floor of their residence and was preparing for bed when she heard the phone ring. Apparently Carter had answered the phone because after completing that phone call, he advised his mother that he was going out for five to ten minutes and he would return shortly. Despite the fact that Carter was to remain at his home in accordance with the terms of his probation, Hill let her son go out for that brief period of time. Carter left the residence and never returned. In the late afternoon of December 17, 1999, Hill reported her son to be missing and ultimately was advised of his death when Carter's body was found on December 30, 1999, in a ravine in Elizabeth Township, Pennsylvania.

Carter had received a telephone call from Jared Houston, (hereinafter referred to as "Houston"), who was also a participant in The Academy probationary program. Houston was on probation for charges of receiving stolen property since he and James Giles, (hereinafter referred to as "Giles"), had stolen a car. Both Houston and Gils were placed in this program and would run into Carter from time to time; however, they knew Carter not just because of the program but also because of the proximity in which they resided in the Glassport area. During this phone call Houston asked Carter if he wanted to smoke some marijuana since he was going to get together with Giles and Gribschaw at Giles' home. When Carter agreed, Houston informed him that he would get a car and pick him up so that they could go to Giles' home where they would smoke marijuana.

Houston testified that the impetus for his phone call was a request made by Gribschaw to get Carter over to Giles' house. Gribschaw had told Houston that he believed that Carter had burglarized his home on several occasions and had threatened his family and, in particular, threatened to burn his house down. On more than one occasion, Gribschaw told Giles that he intended to kill Carter and that he wanted Houston to call him on this particular evening so that he could lure Carter over to Giles' house for the sole purpose of killing Carter. Houston complied with Gribschaw's request and after stealing his uncle's car, picked up Carter and brought him to Giles' house.

Gribschaw and Giles were in the front yard of Giles' home smoking a marijuana blunt and drinking Southern Comfort when Carter and Houston arrived. After a short period of time, it was suggested that the four of them go to the rear of Giles' home so that they would not be observed smoking marijuana. The back yard of Giles' home which is located at 320 Murray Street, abutted the side yard of Gribschaw's home, which is located at 322 Murray Street. After they went to the back yard, they continued to smoke the marijuana and drink the Southern Comfort when Gribschaw left the group momentarily to go into a high grass area where he retrieved a wooden baseball bat and came up behind Gribschaw and struck him in the back of the head, by his own account, at least five more times, although Houston indicated that he struck him at least fifteen times in the head and neck area. When Carter was initially struck and knocked to the ground, he asked Gribschaw why he was doing this to him and Gribschaw responded, because "you robbed my house".

Houston recalled Gribschaw's motive for killing Carter when he initially recounted how Carter was killed and why:

> Q      Did Mr. Carter say anything either as he is falling or after he fell to the ground, sir?
>
> A      After he fell, he said, Why are you doing this?
>
> Q      And what did you observe after that point, sir?
>
> A      Dave said, You robbed my house. And then he just kept hitting him.

Trial Transcript, page 49, lines 11-16.

Even Gribschaw, in his own testimony, acknowledges that the reason that he savagely attacked Carter was because of Gribschaw's belief that Carter had burglarized his home and had repeatedly threatened him.

> Q      After you had knocked Gordon to the ground, you did say to him words along the lines of this is what he gets for robbing your house.
>
> A      I didn't say that.
>
> Q      You didn't say that?
>
> A      I asked him why.
>
> Q      Excuse me?

| | |
|---|---|
| A | I think I asked him why. |
| Q | Why what? |
| A | Why he robbed my house and why he constantly threatened me. |
| Q | So after you cracked him in the back of the head, you ask him as he is laying there motionless on the ground, Why did you rob my house. |
| A | Yes, that's right. |

Trial Transcript page 301, lines 9-23.

This testimony was particularly damaging because it refuted Gribschaw's purported explanation for murdering Carter.  Gribschaw was hitting Carter, not to prevent some future act of arson or an assault of one of his family members but, rather, for what he believed to be Carter's prior criminal history of repeatedly burglarizing Gribschaw's home.

Once Gribschaw stopped hitting Carter with the bat, he gave that bat to Giles, left the scene and went into his home.  Giles took the bat and was going toward the front of his house when he told Houston to get rid of the body. Houston followed him to the front of Giles' home and Giles then gave him the bat and told him to get rid of it because he did not want any part of it and Giles then went inside his home to take a shower.  Houston then returned to the back yard and saw Carter lying face down.  Shortly thereafter, Gribschaw returned to the area where Carter was lying prone and after hearing gurgling sounds emanating from Carter, pulled a string or rope from his shirt pocket and proceeded to strangle Carter.  When it was apparent that Carter was dead, Gribschaw grabbed the body and proceeded to drag it out of Giles' yard.  In order to get Carter's body out of Giles' yard, it was necessary that Gribschaw go down approximately twenty concrete steps to Murray Street.  In the course of traversing the steps, Gribschaw, who was dragging Carter's body face down, dragged him down these concrete steps.  Gribschaw, once he reached the sidewalk, put Carter's body down and then went back to his house to get his car.  Gribschaw drove his car to that spot where he had left Carter's body, opened his trunk and put Carter's body in that trunk and drove away.  The next day Gribschaw called Houston and told him that he had looked in the trunk and that Carter was looking purple.

Several days after Carter's death, Sean Deverse, (hereinafter referred to as "Deverse"), a Glassport police officer who lived in Elizabeth Township, was taking trash out to the curb when he saw a motor vehicle being driven by Gribschaw go past his house.  Deverse also noted that there were two other individuals in his car and that they were heading toward an area near Butler's Golf Course, located in Elizabeth Township.  Although Deverse was aware of the

4

fact that there was a missing person's report with respect to Carter, he did not attach any significance to this fact when he observed Gribschaw.

In the days that followed Carter's death, Gribschaw talked to several people and indicated that he had committed the ultimate sin; in particular, he made this statement to his girlfriend, Kristen Yednak, (hereinafter referred to as "Yednak"). He told Yednak that he hated Carter and that he wanted to kill him. When she heard him make the statement that he had committed the ultimate sin, she originally thought that he possibly cheated on her or that he was using drugs. When she considered his statement about how much he hated Carter and the fact that he wanted to kill him, she concluded that Gribschaw had, in fact, killed Carter.

The day after Gribschaw made this statement to her, she paged him and he returned her call telling her that he was at his cousin's garage. Yednak went to that garage and observed Gribschaw and his cousin, Adam Berilli, (hereinafter referred to as "Berilli"), cleaning the trunk of Gribschaw's car. While she watched them do this, Berilli told Gribschaw that he should have placed a bag over Carter's head so that there would not have been so much blood in his trunk. The next day, while Yednak was babysitting, Gribschaw told her all of the details of how he had killed Carter and disposed of his body. In addition, he told her that he was not sad and felt no remorse about Carter's death because he would no longer have to deal with him and, in fact, that he had not had a better night of sleep than the night that he killed Carter. Gribschaw also confessed to killing Carter to his counsin, Berilli, while they were cleaning out Gribschaw's car. Gribschaw and his cousin cleaned the interior of the trunk and cut out a carpet that was in the trunk because it was too bloodstained.

On December 30, 1999, James Lloyd, (hereinafter referred to as "Loyd"), and his friend William Shaw, (hereinafter referred to as "Shaw"), were scouting out an area to do late season deer hunting when they came across Carter's body. Lloyd and Shaw were near Butler's Golf Course in Elizabeth Township when they looked down into a ravine and saw what appeared to them to be the body of a young, black male, [FN2] who was rolled up into a fetal position and covered with snow. After discovering the body, Lloyd and Shaw went to the Elizabeth Township Police Department to report what they had discovered and officers from that department were dispatched to the scene. When those police officers arrived and viewed Carter's body, it was apparent that he was dead and the Coroner's Office was called to remove the body from the scene. Carter's body was transported to the Allegheny County Coroner's Office and an autopsy was performed on that body but only after it had been allowed to thaw out since the body was frozen to the core.

[FN2] Carter, who was white, suffered extensive trauma to his head and neck and massive bruising of his thighs, which injuries when coupled with

5

the freezing temperatures to which his body had been exposed for two weeks, make it appear that his skin was significantly darker than it normally was.

Dr. Shawn Ladham, a forensic pathologist of the Allegheny County Coroner's Officer, performed the autopsy on Carter's body, initially making an observation of extensive trauma to Carter's head as evidenced by the numerous lacerations and abrasion to his skull. In addition to these external findings with respect to his head, Dr. Ladham noticed two large abrasions extending from the hips to the knees on both thighs. During the internal examination of the body, Dr. Ladham observed a massive subcutaneous hemorrhage to the galea and another large hemorrhage on the left side of the brain, continuing down from the posterior parietal and occipital regions through the cervical spine. Dr. Ladham also observed numerous hemorrhages in the parenchyma of the brain.

In addition to these findings, Dr. Ladham noticed a marked displacement of the second cervical vertebrae forward, thereby impinging upon the spinal cord. It was Dr. Ladham's opinion that as a result of this forward displacement of the second cervical vertebrae, significant damage was caused to the spinal cord, thereby rendering Carter a quadriplegic, unable to defend himself. While Carter may have been rendered a quadriplegic, this injury would not have impaired his ability to speak as evidenced by Carter's question to Gribschaw as to why Gribschaw was attacking him. Dr. Ladham also noticed a mark on Carter's neck in the area of his Adam's apple, which could have been consistent with somebody who was being strangled, although he could not state that fact to a degree of scientific certainty. When Dr. Ladham was asked further on the question of whether or not Carter had been strangled, he indicated that he would have expected to see a more significant abrasion of his neck since an individual who is being strangled would normally attempt to remove that device from his neck by pulling at it with his hands and fingers. In light of the devastating injury that Carter suffered as a result of the trauma done to his second cervical vertebrae, Carter was rendered defenseless since he was unable to use his hands due to the fact that he was paralyzed from the neck down. Dr. Ladham testified that the cause of death was blunt force trauma to the head and neck and the manner of death in this case was a homicide.

Gribschaw presented two factual witnesses in his defense, numerous character witnesses and one expert witness. His first factual witness, Giles, then age sixteen, testified that beginning at approximately 8:00 p.m. on December 16, 1999, he and Gribschaw were partying. Giles' definition of partying meant that they were smoking marijuana blunts, drinking Southern Comfort, and snorting Special K. In order to make Special K, they obtained liquid Ketamine, put it in a microwave oven, cooked it until it crystalized, and then snorted those crystals. At approximately 1:00 a.m., Giles received a phone call from Houston asking him what he was doing and Giles told him that he was partying with Gribschaw. Giles

knew Houston from the Glassport area and also by virtue of the fact that he was another participant in The Academy program since he was Houston's co-defendant in stealing the car which placed Houston in that program.

After receiving Giles invitation to join them, Houston picked up Carter and went to Giles' house. When they arrived at Giles' house, they all went to the back of Giles' home and were smoking a marijuana blunt. Giles indicated that Gribschaw, whom he considered to be like his brother, was irritated that Carter was there since there was bad blood between these two individuals. Shortly after they had gone to the back yard, he heard a smack and saw Carter on the ground being beaten by Gribschaw with a baseball bat. Gribschaw gave him the bat and he ran to the front of his house, only to be followed by Houston. Before going into the house, Giles told Houston to get rid of the bat and also to get rid of Carter's body. After he had gone into the house, Giles took a shower and waited for a period of time before he went outside to make sure that Carter's body was gone. When he went outside, everyone had gone and Carter's body was no where to be found. Gils did, however, discover the baseball bat and put it in his garage and, several days later, put it out with the trash.

Gribschaw testified that he had a number of problems with Carter in that he believed that Carter had burglarized his house on at least six separate occasions. Despite the fact that he and his family had reported these burglaries to the Glassport Police, together with their suspicions that Carter was the burglar, they believed that the police did not act on their reports. Gribschaw indicated that he did not trust the Glassport Police, especially as it pertained to Carter. Gribschaw testified that on the day preceding the homicide, he was feeling the stress of maintaining a job, going to college and dealing with the threats that Carter had made to him and his family, in particular, the threat to burn his house down and hurt his family, especially his younger sister. As a result of this stress, he had smoked marijuana early that day and continued smoking it until Carter's death.

Gribschaw agreed with Giles that they began their partying somewhere around 8:00 p.m. on December 16, 1999, and had consumed almost a fifth of Southern Comfort between the two of them. In addition, he testified that he had smoked marijuana blunts almost the entire day and used Special K several times during that evening and that as a result of the combination of these three substances that he was grossly intoxicated. When Houston called to inquire as to what they were doing, Gribschaw also agreed with Giles that he could come over and party with them but he was surprised and somewhat disturbed to find out that Houston had brought Carter with him. After spending a short period of time in Giles' front yard, they all went to the back yard and were smoking marijuana blunts when Carter made several veiled threats against Gribschaw. Gribschaw left the group and was urinating in the high grass when he heard Carter say to the others that he was surprised that Gribschaw's house was still there and had not

burned down yet.  Gribschaw testified that when he heard this statement and Carter's subsequent laugh, he snapped out.  He became fixated about Carter burning his house down and injuring his family, and when he looked down on the ground he saw a baseball bat.  He picked up the baseball bat and hit Carter in an attempt to stop him from committing these crimes against his family.  Gribschaw acknowledged that he hit Carter at least five times, after knocking him to the ground; however, he specifically denied strangling Carter.  Once Gribschaw knew that Carter was dead, he and Houston dragged him out of Giles' yard, down the concrete steps, and Gribschaw put him in his trunk and later disposed of the body in the ravine in Elizabeth Township.  Gribschaw also acknowledged that he told his girlfriend, his cousin and then several friends that he had committed this homicide.

(Resp's Ex. 10, ECF No. 13-3 at pp.6-16.)[1]

## B.    **Relevant Procedural Background**

On January 4, 2000, Petitioner was charged by Criminal Information filed in the Court of Common Pleas of Allegheny County, Criminal Division at CC 200002746 with one count of Criminal Homicide.[2]  (Resp's Ex. 1, ECF No. 13-1 at pp.1-20; Ex. 2, ECF No. 13-1 at pp.21-24.)

On September 24, 2001, Petitioner, through William H. Difenderfer, Esquire, filed a Notice of Insanity or Mental Infirmity Defense.  (Resp's Ex. 3, ECF No. 13-1 at pp.25-38.)  The following day, the Commonwealth, through Deputy District Attorney Daniel E. Fitzsimmons, Esquire, filed a Motion in Limine seeking to preclude the testimony of Petitioner's psychiatric expert.  (Resp's Ex. 4, ECF No. 13-1 at pp.39-44.)

On September 25, 2001, Petitioner appeared before the Honorable David R. Cashman and completed a Waiver of Jury Trial form.  (Resp's Ex. 5, ECF No. 13-1 at pp.45-49.)  After a colloquy on the record, Petitioner waived his right to a jury trial and proceeded non-jury.  (Trial

---

[1] A list of Respondents' exhibits and their corresponding page numbers are docketed at ECF No. 13.  The exhibits will be referred to herein by their exhibit number and corresponding ECF number.

[2] 18 Pa. C.S.A. § 2501

Tr., 6-10.)  At the conclusion of the trial, on September 27, 2001, Judge Cashman found

Petitioner guilty of First Degree Murder.  (Trial Tr., 357.)

On December 11, 2001, Petitioner appeared before Judge Cashman for sentencing, and

Judge Cashman sentenced him to life imprisonment without the possibility of parole.  (Sent. Tr.,

34.)

On December 18, 2001, Petitioner, through Attorney Difenderfer, filed a Motion to

Extend Time for Filing Post Sentence Motions Pursuant to Pa.R.Crim.P. 720, which was granted.

(Resp's Ex. 6, ECF No. 13-2 at pp.1-6.)  On January 16, 2002, Petitioner through Attorney

Difenderfer, filed a Post Sentence Motion wherein he argued that because of Petitioner's level of

voluntary intoxication the degree of guilt should be reduced to Third Degree Murder.  (Resp's

Ex. 7, ECF No. 13-2 at pp.7-12.)

On April 23, 2002, Petitioner appeared before Judge Cashman for a post trial hearing,

where he was represented by Attorney Difenderfer.  On April 24, 2002, Judge Cashman denied

the Post Sentence Motion.  (Resp's Ex. 7, ECF No.13-2 at pp.7-12.)

On May 23, 2002, Petitioner filed a *pro se* Notice of Appeal and Request for

Appointment of Public Defender.  (Resp's Ex. 8, ECF No. 13-2 at pp.13-18.)  On June 5, 2002,

the Office of the Public Defender was appointed to represent Petitioner.  On February 18, 2003,

Petitioner, through Suzanne Swan, Esquire, of the Office of the Public Defender, filed a Concise

Statement of Matters Complained of on Appeal pursuant to Pa. R.A.P. 1925(b).  (Resp's Ex. 9,

ECF No. 13-2 at pp.19-23.)  On April 17, 2003, Judge Cashman filed his Pa. R.A.P. 1925(a)

Opinion.  (Resp's Ex. 10, ECF No. 13-3 at pp.1-27.)

On August 5, 2003, Petitioner, through Attorney Swan, filed a Brief for Appellant in the

Superior Court of Pennsylvania, which was docketed at No. 879 WDA 2002.  (Resp's Ex. 12,

ECF Nos. 13-4, 13-5, 13-6.) The Brief for Appellee was filed on September 2, 2003. (Resp's Ex. 13, ECF No. 13-7 at pp.1-26.) On January 6, 2004, the Superior Court affirmed the judgment of conviction but deferred the claims of ineffective assistance of counsel to Post Conviction Relief Act proceedings pursuant to Commonwealth v. Grant, 813 A.2d 726 (2002). (Resp's Ex. 14, ECF No. 13-7 at pp.27-38.)

On January 27, 2004, Petitioner, through Attorney Swan, filed a Petition for Allowance of Appeal in the Supreme Court of Pennsylvania, which was docketed at No. 66 WAL 2004. (Resp's Exs. 15-16, ECF Nos. 14-1, 14-2, 14-3, 14-4.) On September 8, 2004, the Supreme Court denied the petition. (Resp's Ex. 17, ECF No. 14-5 at p.1.)

On September 6, 2005, Petitioner, through Charles R. LoPresti, Esquire, filed a Motion pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"). (Resp's Ex. 18, ECF No. 14-5 at pp.2-26.) On December 16, 2005, Petitioner, through Attorney LoPresti, filed an Amended/Supplemental Motion for Post Conviction Relief. (Resp's Ex. 19, ECF No. 14-5 at pp.27-33.) On February 21, 2006, the Commonwealth filed an Answer to the Motion for Post Conviction Relief. (Resp't Ex. 20, ECF No. 14-6 at pp.1-20.) On May 8, 2006, Petitioner, through Attorney LoPresti, filed a Second Supplemental and Amended Motion for Post Conviction Relief. (Resp't Ex. 21, ECF No. 14-7 at pp.1-37.) On May 12, 2006, Petitioner, through Attorney LoPresti, filed a Concise Statement of Trial Counsel, William Difenderfer. (Resp't Ex. 22, ECF No. 14-7 at pp.38-40.)

On October 31, 2007, Petitioner appeared before Judge Cashman for an evidentiary hearing. Petitioner was represented by Attorney LoPresti and Attorney Difenderfer, Patricia Gribschaw and Petitioner testified on behalf of Petitioner. Deputy District Attorney

Fitzsimmons testified on behalf of the Commonwealth. Following the hearing, Petitioner requested additional time to present a toxicologist.

On January 24, 2008, Petitioner appeared before Judge Cashman for another evidentiary hearing, where he was represented by Attorney LoPresti. At the proceeding, Petitioner did not present a toxicologist and withdrew the claim. Following an oral argument, Judge Cashman dismissed the petition. (Resp't Ex. 23, ECF No. 14-8 at p.1.)

On February 20, 2008, Petitioner, through Attorney LoPresti, filed a Notice of Appeal. (Resp't Ex. 24, ECF No. 14-8 at pp.2-21.) On March 11, 2008, Petitioner, through Attorney LoPresti, filed a Concise Statement of Matters Complained of on Appeal. (Resp't Ex. 25, ECF No. 14-8 at pp.22-27.) On August 21, 2008, Judge Cashman filed his Pa. R.A.P. 1925(a) Opinion. (Resp't Ex. 26, ECF No. 14-9.)

On December 9, 2008, Petitioner, through Attorney LoPresti, filed a Brief for Appellant in the Superior Court of Pennsylvania, which was docketed at No. 346 WDA 2008. (Resp't Ex. 27, ECF No. 15-1; Ex. 28, ECF Nos. 15-2, 15-3, 15-4.) The Commonwealth filed its Brief for Appellee on December 22, 2008. (Resp't Ex. 29, ECF No. 15-5 at pp. 1-36) On March 20, 2009, the Superior Court affirmed the judgment of the Court of Common Pleas. (Resp't Ex. 30, ECF No. 15-5 at pp. 37-42.)

On April 11, 2009, Petitioner filed a *pro se* Petition for Allowance of Appeal in the Supreme Court of Pennsylvania., which was docketed at No. 164 WAL 2009. (Resp't Ex. 31, ECF No. 15-5 at pp.43-46; Ex. 32, ECF No. 15-6, 15-7.) On June 1, 2009, Petitioner filed *a pro se* Motion for Assignment of Counsel. (Resp't Ex. 33, ECF No. 15-8 at pp.1-4.) On June 25, 2009, Attorney LoPresti filed a Petition to Withdraw as Counsel. (Resp't Ex. 34, ECF No. 15-8 at pp.5-9.) On August 6, 2009, the Supreme Court remanded the case to the Court of Common

Pleas of Allegheny County to determine if Petitioner was entitled to court appointed counsel. (Resp't Ex. 35, ECF No. 15-8 at p.10.)  On August 21, 2009, Judge Cashman appointed Thomas N. Farrell, Esquire, to represent Petitioner.  (Resp't Ex. 36, ECF No. 15-8 at p.11.)

On October 20, 2009, Petitioner, through Attorney Farrell, filed an Amended Petition for Allowance of Appeal in the Supreme Court.  (Resp't Ex. 37, ECF No. 15-9, 15-10.)  On July 27, 2010, the Supreme Court denied the petition.  (Resp't Ex. 38, ECF No. 15-11.)

On August 23, 2010, Petitioner filed a *pro se* Petition for Writ of Habeas Corpus and Brief in Support in the above-captioned case number.  (ECF No. 1.)  On October 12, 2010, the Commonwealth filed an Answer to the Petition.  (ECF No. 12-15.)

On September 1, 2010, Petitioner filed, in the Court of Common Pleas of Allegheny County, a *pro se* Modification of Sentence Nunc Pro Tunc.  (Resp't Ex. 39, ECF No. 43-1 at pp.1-7.)  He filed a Memorandum of Law in Support of Modification of Sentence Nunc Pro Tunc on October 28, 2010.  (Resp't Ex. 40, ECF No. 43-1 at pp.8-17.)  On July 26, 2011, Judge Cashman issued an Amended Order of Court, which corrected a clerical error in the December 11, 2001 Sentencing Order.  (Resp't Ex. 41, ECF No. 43-1 at p.18.)  The Amended Order corrected the reference to 42 Pa. C.S.A. § 9715 to 42 Pa. C.S.A. § 9711.

On July 27, 2011, Judge Cashman issued a Notice of Intent to Dismiss.  (Resp't Ex. 42, ECF No. 43-1 at p.19.)  On August 8, 2011, Petitioner filed a *pro se* Defendant's Reasons for a Sentencing Hearing.  (Resp't Ex. 43, ECF No. 43-1 at pp.20-29.)  On September 15, 2011, Judge Cashman denied Petitioner's petition.  (Resp't Ex. 44, ECF No. 43-1 at p.30.)

October 1, 2011, Petitioner filed a *pro se* Notice of Appeal.  (Res't Ex. 45, ECF No. 43-1 at pp.31-32.)  On December 7, 2011, Petitioner filed a *pro se* Statement of Matters pursuant to

Pa. R.A.P. 1925(b).  (Resp't Ex. 46, ECF No. 43-1 at pp.33-43.)  On January 12, 2012, Judge

Cashman filed his Pa. R.A.P. 1925(a) Opinion.  (Resp't Ex. 47, ECF No. 43-1 at pp.36-43.)

On October 15, 2012, Petitioner filed a *pro se* Brief for Appellant in the Superior Court

of Pennsylvania, which was docketed at No. 1721 WDA 2011.  (Resp't Ex. 49, ECF No. 43-2.)

On November 1, 2012, the Commonwealth filed its Brief for Appellee.  (Resp't Ex. 50, ECF

No.43-3 at pp.1-25.)  On November 11, 2012, Petitioner filed a *pro se* Appellant/Petitioner's

Response Brief.  (Resp't Ex. 51, ECF No. 43-3 at pp.26-33.)  On March 12, 2013, the Superior

Court affirmed the judgment of the Court of Common Pleas.  (Resp't Ex. 52, ECF No. 43-4 at

pp.1-7.)  On March 19, 2013, Petitioner filed a *pro se* Appellant's Application for Reargument.

(Resp't Ex. 53, ECF No. 43-4 at pp.8-18.)  On April 26, 2013, the Superior Court denied

reargument.  (Resp't Ex. 54, ECF No. 43-4 at p.19.)

On May 17, 2013, Petitioner filed a *pro se* Petition for Allowance of Appeal in the

Supreme Court of Pennsylvania, which was docketed at No. 237 WAL 2013.  (Resp't Ex. 55,

ECF No. 43-4 at pp.20-22; Ex. 56, ECF No. 43-5 at pp.1-22.)  On September 18, 2013, the

Supreme Court denied the petition.  (Resp't Ex. 57, ECF No. 43-5 at p.23.)

On April 26, 2012, the Commonwealth filed a Motion to Stay in the above captioned

case.  (ECF No. 34.)  On April 27, 2012, this Court granted the Commonwealth's motion and

directed the parties to notify this Court when the state court proceedings were concluded.  (Text

Order 4/26/12.)  On October 3, 2013, this Court lifted the stay.  (ECF No. 38; Text Order

10/3/13.)  On October 15, 2013, Petitioner filed a *pro se* Supplement to his Petition.  (ECF No.

40.)  He filed another Supplement on August 11, 2014.  (ECF No. 49.)

C.      **Habeas Standard**

Where the state courts have reviewed a federal issue presented to them and disposed of the issue on the merits, AEDPA provides the applicable deferential standards by which the federal habeas court is to review the state court's disposition of that issue.  *See* 28 U.S.C. § 2254(d) and (e).  In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court expounded upon the standard found in 28 U.S.C. § 2254(d).  In Williams, the Court explained that Congress intended that habeas relief for errors of law may only be granted in two situations: (1) where the State court decision was "contrary to . . . clearly established Federal law as determined by the Supreme Court of the United States" or (2) where the State court decision "involved an unreasonable application of[] clearly established Federal law as determined by the Supreme Court of the United States."  Id. at 404-05.  The Court explained the two situations in the following terms:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13.  The Court of Appeals for the Third Circuit has also elucidated the "contrary to" clause by noting that "it is not sufficient for the petitioner to show merely that his interpretation of Supreme Court precedent is more plausible than the state court's; rather, the petitioner must demonstrate that Supreme Court precedent requires the contrary outcome."  Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000) (quoting Matteo v. Superintendent, SCI-Albion, 171 F.3d 877, 888 (3d Cir. 1999) (*en banc*)).  Moreover, the "unreasonable application" test is an objective one; "a federal court may not grant habeas relief merely because it concludes

14

that the state court applied federal law erroneously or incorrectly." Jacobs v. Horn, 392 F.3d 92, 100 (3d Cir. 2005) (citation omitted). It is Petitioner's burden to prove the State court decision is either contrary to or an unreasonable application of clearly established Federal law. *See* Matteo, 171 F.3d at 888; Werts, 228 F.3d at 197.

AEDPA also permits federal habeas relief where the State court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Section 2254(d)(2) mandates the federal habeas court to assess whether the state court's determination was reasonable or unreasonable given that evidence. If the state court's decision based on such a determination is unreasonable in light of the evidence presented in the state court proceeding, habeas relief is warranted. Within this overarching standard, of course, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision. Here, section 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence. Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004).

### D. <u>Ineffective Assistance of Counsel Standard</u>

Ineffective assistance of counsel claims are "governed by the familiar two-prong test set forth in Strickland v. Washington, 466 U.S. 668 (1984)." Shelton v. Carroll, 464 F.3d 423, 438 (3d Cir. 2006) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003)). For AEDPA purposes, the <u>Strickland</u> test qualifies as "clearly established Federal law, as determined by the Supreme Court." Williams v. Taylor, 529 U.S. 362, 391 (2000). Under <u>Strickland</u>, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result

would have been different.  466 U.S. at 687.  For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms."  Id. at 688.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.

With respect to the sequence of the two prongs, the Strickland Court held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  466 U.S. at 697.  In assessing an ineffective assistance of counsel claim, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding . . . .  In every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results."  Id. at 696.

E.    **Discussion**

1.    **Trial counsel was ineffective for failing to raise a challenge that the verdict was against the weight of the evidence and/or in failing to argue that the verdict was against the weight of the evidence.**

First, Petitioner claims that trial counsel was ineffective for failing to present a claim either orally or in written motion that the verdict was against the weight of the evidence.[3]

_____

[3] In Petitioner's supplement to his Petition, (ECF No. 40), he added that trial counsel was ineffective for not challenging the weight of the evidence on the basis of the cause of death because there was no evidence that he strangled the victim.  Id. at pp.1-4.

In his August 21, 2008 Pa. R.A.P. 1925(a) Opinion, Judge Cashman found that trial counsel's post-sentence motion, although improperly titled as a "motion for reconsideration/to modify sentence," was essentially a challenge to the sufficiency and/or weight of the evidence which resulted in Petitioner's conviction, and the court construed it as such, ultimately finding that the evidence was sufficient to support Petitioner's first-degree murder conviction and that the Commonwealth proved beyond a reasonable doubt that Petitioner was responsible for the victim's death and that death constituted first-degree murder. Specifically, Judge Cashman stated as follows:

> Gribschaw's initial claim of the ineffectiveness of his trial counsel is that his counsel did not file either prior to sentencing or following sentencing, a motion claiming that the verdict was against the weight of the evidence. In this regard, Gribschaw maintains that the expert testimony that he presented was more than sufficient to demonstrate, because of his intoxication, that he was incapable of forming the specific intent to kill required for a conviction of first-degree murder and, accordingly, he should have been convicted of third degree murder. Gribschaw does not maintain that he is not culpable for the commission of the crime of criminal homicide but, rather, maintains that the weight of the evidence did not support his conviction for first degree murder.

> * * * *

> In Gribschaw's case, his trial counsel did file a post-sentencing motion; however, that motion was entitled a "motion for reconsideration/to modify his sentence." That motion on its face was fatally defective since Gribschaw was convicted of first-degree murder and the mandatory sentence of life without the possibility of parole had to be implemented. 18 Pa. C.S.A. § 1102(a)(1). Even though Gribschaw's post-sentencing motion was entitled a "motion for reconsideration/to modify his sentence" it was in effect a request to challenge the sufficiency and/or weight of the evidence, which resulted in his conviction. This fact is underscored by the hearing on this motion where this Court observed that the issue being raised by Gribschaw's counsel was not a modification of his sentence, which could not be done on a mandatory sentence, but, rather, a request to reexamine the evidence to determine whether or not Gribschaw should have been convicted of third degree murder rather than first degree murder.

> THE COURT: I don't think that's the issue in terms of whether you reconsider, because what occurred at the

sentencing isn't what you are asking. What your [sic] asking me to do is look at all the evidence and say that I was mistaken when I found the level of culpability to be murder of the first degree as opposed to murder of the third degree; so we then get to the question ultimately what it comes down to, whether or not that's true.

Post-Trial Hearing, April 23, 2002, pp. 5-6; lines 16-3.

In reviewing the transcript of that hearing, it is clear that both Gribschaw's lawyer and the Assistant District Attorney were discussing the evidence as to whether or not it supported the verdict of first-degree murder.

Since Gribschaw's post-sentencing motion was inartfully phrased, this Court reviewed that motion in light of the standards applicable both to a motion challenging the sufficiency of the evidence and a motion suggesting that the verdict was against the weight of the evidence. In examining the evidence in the light most favorable to the Commonwealth, this Court found that the evidence was more than sufficient to make the determination that Gribschaw's killing of Carter was a malicious, premeditated killing satisfying the requirements for a conviction of first-degree murder. Alternatively, viewing Gribschaw's post-sentencing motion as a motion that the verdict was against the weight of the evidence also failed since the verdict rendered in this case does not demonstrate a severe miscarriage of justice, which would tend to shock one's sense of justice. This Court found a premeditated, deliberate, willful and malicious plan organized by Gribschaw and carried out by he and his unindicted co-conspirators. Gribschaw requested that the victim be brought to the area where he and the others were smoking marijuana, snorting Special K, and drinking Southern Comfort. Once Carter arrived on the premises, Gribschaw was the one who suggested that they move to the back of the residence so that they could not be observed from the street. When they went to the backyard, Gribschaw then excused himself indicating that he had to urinate and he picked up a bat and then bludgeoned Carter. Despite being severely beaten by Gribschaw, which beating rendered him a quadriplegic, Gribschaw heard him gurgling and then left the scene and went to his house, got a string and returned so that he could insure that Carter was dead by garroting him. The Commonwealth established all of the elements necessary to prove a deliberate, premeditated killing with malice and the verdict of first-degree murder that was entered was properly entered. Since there is no basis for the claim that the verdict was against the weight of the evidence, Gribschaw's trial counsel could not have been ineffective for failing to file such a motion.

When examining the claim that the verdict was against the weight of the evidence, it is clear that Gribschaw truly is maintaining that the evidence was insufficient to support the verdict. In this regard, Gribschaw has maintained that

18

this Court disregarded the credible testimony of Dr. Bruce Wright. What Gribschaw misconstrues, however, is this Court's assessment of Dr. Wright's testimony. This Court believed in Dr. Wright's assessment and found him to be a credible expert witness. Dr. Wright was fully conversant with Gribschaw's psychiatric background and was also conversant with the use and abuse of alcohol and controlled substances. What this Court did not believe, however, was the hypothetical fact pattern that Gribschaw was incapable of forming the specific intent to kill necessary for a first-degree murder conviction.

The testimony at the time of trial only quantified the alleged consumption of alcohol as being a portion of a fifth of Southern Comfort, since this alcohol was being consumed not only be Gribschaw, but also by the other individuals who were present at Giles' home. Gribschaw's description of his consumption of marijuana was nothing more than he was smoking marijuana blunts all day and that he had taken four bumps of Special K. It was unknown what quantities of marijuana and Special K Gribschaw personally ingested. Despite his use of all of these substances, none of the individuals who testified noticed that he was slurring his words or that he was unsteady on his feet. In fact, Houston indicated that Gribschaw was the one who suggested that Carter be invited to their party. Gribschaw was also sufficiently clear-headed to hear Carter gurgling and determine that he was not dead and then go search for another weapon to use to ultimately kill him. Gribschaw formed the intent to kill Carter and told not only one of his unindicted co-conspirators, but, also, his girlfriend, Kristen Yednak, (hereinafter referred to as "Yednak"). Trial Transcript, p. 149, lines 23-25. Yednak testified at the time of trial that sometime between August and December 1999, Gribschaw told her of his hatred for Carter and that he intended to kill him. Trial Transcript, p. 149, lines 23-25; p. 150, lines 1-6.

Had the facts been as Gribschaw suggested to Dr. Wright, Gribschaw would have been able to avail himself of the evidence of involuntary intoxication so as to reduce his culpability for the homicide that he committed. . . . . The evidence presented at the time of trial did not rise to the level that showed that Gribschaw was so intoxicated that he could not form a specific intent to kill. Rather, Gribschaw previously announced to his girlfriend his intent to kill and declared the same intention to his unindicted co-conspirators, acted on that intention by not only bludgeoning Carter with a baseball bat but, when he discovered that he was still alive, went back into his home to grab a string to ensure that he could complete the killing by strangling Carter. It is clear that the evidence that was presented by the Commonwealth proved beyond a reasonable doubt that Gribschaw was responsible for Carter's death and that that death constituted first-degree murder.

(Resp't Ex. 26, ECF No. 14-9 at pp.21-24) (footnotes omitted).

As noted in his Opinion, Judge Cashman found that trial counsel was not ineffective in the manner alleged because there was no basis for the claim that the verdict was against the weight of the evidence. The Superior Court of Pennsylvania affirmed on appeal on the basis of Judge Cashman's Opinion.[4] (Resp't Ex. 30, ECF No. 15-5 at pp.37-42.)

Petitioner claims that the post-sentence motion filed by trial counsel "did not include any language raising a challenge to the weight and/or sufficiency of the evidence or otherwise alleg[e] the existence of trial errors." (ECF No. 4 at p.25.) Instead, he states that the post-sentence motion focused on Petitioner's job, college, history, family, and remorse but did not contain any statements based in law or fact "to be equated with a challenge to the weight and/or sufficiency of the evidence or request for a new trial, which were the only legitimate claims to raise to contest [Petitioner]'s verdict and sentence." Id. at p.26. As such, Petitioner claims that his trial counsel "demonstrated an obvious misunderstanding of and ignorance to well-established law, which constituted a serious misstep in his obligations as a lawyer and clearly undermined [Petitioner]'s constitutional right to effective representation in his defense." Id.

Petitioner also claims that the trial court's construction and examination of trial counsel's post-sentence motion as a challenge to the sufficiency and weight of the evidence was "nothing more than a general recapitulation of the evidence presented at trial and included no substantial review of Dr. Wright's testimony, the Commonwealth's failure to produce an expert witness, and the credibility of the prosecution witnesses, namely Huston [sic] and Gile." (ECF No. 4 at pp.26-27.) He also contends that, despite the trial court's own statement that on-the-record

---

[4] The Superior Court reached its conclusion rather summarily and without any explanation. Nevertheless, there is no requirement that a state court's decision be accompanied by an explanation in order for it to qualify as an "adjudication" on the merits under § 2254(d). Harrington v. Richter, 562 U.S. 86, 98 (2011) (citing, *inter alia*, Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002)).

examination of the trial evidence was performed in consideration of both the weight-of-the-evidence standard and the sufficiency-of-the-evidence standard, the trial court did not consider the evidence for its weight and that trial counsel was ineffective in failing to request and ensure that such examination was made.  Id. at p.29.

A stand-alone claim challenging to the weight of the evidence would require an evaluation of the credibility of the evidence presented at trial.  *See* Tibbs v. Florida, 457 U.S. 31, 37-38 (1982) (weight of the evidence raises questions of credibility).  Federal habeas courts, however, lack the authority to assess the credibility of the witnesses at trial.  *See* Marshall v. Lonberger, 459 U.S. 422, 434-45 (1983) (federal courts are not permitted "to redetermine [the] credibility of witnesses whose demeanor has been observed by the state trial court"); Demosthenes v. Baal, 495 U.S. 731, 735 (1990) (federal habeas court is bound by a state court's factual findings with respect to issues of credibility).  It follows that a claim that the evidence at a criminal trial is against the weight of the evidence is beyond the scope of a federal habeas proceeding.  Alamo v. Frank, 1999 WL 79659, at *1 n.2 (E.D. Pa. Jan. 15, 1999) (Shapiro, J.) ("[i]t is beyond the province of this court to consider the weight, as opposed to the sufficiency of the evidence").

While Petitioner raises his claim in terms of ineffective assistance of trial counsel, this this does not change the result.  First, the trial court did review trial counsel's post-sentence motion as a challenge to both the sufficiency and weight of the evidence, and, in order to be entitled to relief, Petitioner would have to show that the state court was incorrect in its assessment of state law.  However, this Court is bound by the state courts' determination that the verdict was not against the weight of the evidence because such a claim is a matter of state law that a federal habeas court cannot reexamine.  *See* Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)

("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Wainwright v. Goode, 464 U.S. 78, 84 (1983) (stating that federal courts are bound by a state court's interpretation of state law); Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) (federal habeas court bound by the state court's determination that the instruction at issue comported with state law). Therefore, the very premise of Petitioner's ineffectiveness claim is without foundation. Consequently, Petitioner is not entitled to relief on this claim.

### 2. Waiver of constitutional right to a jury trial was not knowingly, intelligently and voluntarily made due to trial counsel's inducement.

Petitioner's second claim is that his waiver of his right to a jury trial was not knowing, intelligent or voluntary due to Attorney's Difenderfer's inducement. Petitioner argues that Attorney Difenderfer advised him to waive his right to a jury trial for various reasons, including the horrific facts of the case and trial counsel's close relationship with the trial court. Petitioner, however, states that Attorney Difenderfer never fully described to him the benefits of proceeding with a jury trial or a non-jury trial and that Attorney Difenderfer devoted an inadequate amount of time to advising him as to the law and facts relevant to the case to ensure that his decisions were intelligent and informed. (ECF No. 4 at pp.31-32.)

Petitioner raised this claim in his PCRA petition as a claim of ineffective assistance of trial counsel. (Respt's Ex. 18, ECF No. 14-5 at pp.2-26; Ex. 19, ECF No. 14-5 at pp.27-33; Ex. 21, ECF No. 14-7 at pp.1-37.) At a hearing on the petition on October 31, 2007, Attorney Difenderfer was asked to discuss his reasons for recommending a non-jury trial to Petitioner and his mother and Difenderfer stated that it was based on Petitioner's youth, which he believed might make the court sympathetic towards him; his knowledge of Judge Cashman; and the fact

that he was going to offer character witnesses. (PCT1<sup>5</sup> pp.20-21.) He also stated that he "thought that a jury would be horrified by the facts of this case" and that the actual event as it took place "would have had a very chilling effect on lay people." Id. at p.21. He further stated, "When you have a judge in our Common Pleas that hears this daily, I don't think it would have the shock value with the court." Id.

Attorney Difenderfer also testified that he never promised any result in exchange for the decision to go non-jury. Id. at p.22. He stated that he went over with Petitioner all of the information contained in the jury waiver colloquy, discussed these issues with Petitioner in length, and explained the pros and cons to him. Id.

Petitioner's mother, Patricia Gribschaw, testified that she recalled having a discussion with Petitioner concerning what Attorney Difenderfer had told her about the decision whether to go jury or non-jury, and that, based on Attorney Difenderfer's recommendation, she advised Petitioner to go non-jury. Id. at pp.23-24. She stated that Attorney Difenderfer told her that he was good friends with the judge, and that the judge did not like Mr. Fitzsimmons, but had a better rapport with him. Id. at p.24-25. After she was told these things, in addition to Attorney Difenderfer's opinion that a jury would be horrified by the evidence, she believed that his advice to go non-jury was correct. Id. at p.25.

Petitioner testified that Attorney Difenderfer visited him only two times, sixteen months apart, between his incarceration on January 4, 2000 and the trial. Id. at p.26. He said that on his initial visit, Attorney Difenderfer said that he would keep in touch, but that he did not, and that he received only parts of the discovery materials, and no crime scene photographs. Id. at pp.27-

---

<sup>5</sup> PCRA Hearing Transcript, October 31, 2007.

28. He testified that he did not know the crime scene photos existed until the day of trial and he did not get a chance to review them. Id. at p.28.

Petitioner further testified that in his second meeting with Attorney Difenderfer prior to trial, he was informed of the discussion Attorney Difenderfer had with his mother concerning choosing a non-jury trial, and he agreed that the factors about which his mother had testified had played a role in his decision to agree to a non-jury trial. Id. at pp.29-30. He stated that Attorney Difenderfer told him that Judge Cashman would see his record and compare it to that of the victim and learn that Petitioner "had only one blemish, one fault, and Gordon had a long criminal record." Id. at p.30. Based on all of this, Petitioner stated, he came to court and completed both a written and an oral waiver indicating that he understood his right to a jury trial. Id. at pp.30-31.

Petitioner recalled the on-the-record colloquy waiving his right to a jury trial but he stated that he had been told to answer yes to every question, including whether he had a full and ample opportunity to discuss the case with Attorney Difenderfer. Id. at pp.35-37. Confronted with his answers, Petitioner testified that he was lying during the colloquy. Id. at p.37.

At a continued hearing held on January 24, 2008, no testimony was offered, but counsel made argument. On the point of whether Attorney Difenderfer was adequately prepared or had adequately prepared Petitioner for trial, PCRA counsel, Attorney LoPresti, suggested that Petitioner's recollection of the number of visits was more accurate than that of Attorney Difenderfer. (PCT2[6] at pp.9-10.) He stated that one of the crucial decisions to be made in a trial is whether to proceed jury or non-jury, and while he agreed that Petitioner had declared to the court that he was making a knowing and intelligent decision to proceed non-jury, he suggested

_____

[6] PCRA Hearing Transcript, January 24, 2008.

that Petitioner had been relying on counsel's expertise, which had been filtered through his family.  Id. a pp.11-12.

When Attorney LoPresti suggested that the potentially prejudicial impart of the photographs in this case could have been mitigated by a pre-trial motion in limine, Judge Cashman stated that it was not so much the photographs that would have possibly inflamed the jury, but the facts of the crime itself.  Id. at pp.12-15.  Judge Cashman went on to note that the non-jury colloquy had been very specific, and that Petitioner had answered appropriately.  Id. at p.16.  Although Attorney LoPresti suggested that "[a] lot of the discussions about whether to go jury or non-jury actually was translated through Ms. Gribschaw and her husband to their son," Judge Cashman again pointed to the colloquy.  Id. at pp.16-17.  Attorney LoPresti maintained, however, that there had been insufficient contact between Petitioner and Attorney Difenderfer for Petitioner to make an informed decision on this point.  Id. at p.18.

In addressing this claim in his Pa. R.A.P. 1925(a) Opinion dated August 21, 2008, Judge Cashman stated as follows:

> His counsel's testimony as to the amount of effort and preparation that was put into Gribschaw's case was supported by the testimony of Gribschaw's own mother when she described the numerous times that William Difenderfer, (hereinafter referred to as "Difenderfer"), met with she and her husband to discuss Gribschaw's trial strategy.  While Difenderfer testified that he had trial numerous cases in front of this Court and that he had received favorable results, his recommendation that Gribschaw proceed with a non-jury trial was not predicated on some type of personal relationship with this Court but, rather, on the basis that he believed that a jury would be appalled by the gruesome facts of Gribschaw's case and that a non-jury trial would be better for the sole legal issue that was going to be presented and that was the ability of Gribschaw to form the specific intent to kill.  Difenderfer was convinced that in light of the experience of the trial judge in hearing these types of a cases on a daily basis, that the Trial Court could easily put aside any feelings of outrage because of the brutal, savage killing of Carter and decide the one issue that had to be resolved.

Judge Cashman further stated:

. . . Gribschaw has suggested that his decision to waive his right to a jury trial was predicated upon Difenderfer's representation that he had a personal relationship with this Court, which is premised upon the fact that he belonged to the same country club as this Court. In his testimony at the time of the hearing on Gribschaw's petition, Difenderfer explained that he tried numerous cases before this Court and been reasonably successful; however, he denied that the decision to proceed with a jury trial was predicated upon some personal relationship that he had with this Court but, rather, his belief that it would be in Gribschaw's best interest to proceed with a non-jury trial rather than a jury trial because of the gruesome facts of Gribschaw's case. As previously noted, this information was supported by the testimony of Gribschaw's mother.

Gribschaw's case was not to be decided on the question of whether or not he was guilty of the crime of criminal homicide but, rather, what degree of that crime. The issue that was to be decided was whether or not Gribschaw's alleged intoxication rendered him incapable of forming the specific intent to kill. It was Difenderfer's professional opinion that this Court would be better able to dispassionately review the facts in Gribschaw's case to make a determination as to whether or not the Commonwealth had established the elements of first degree murder or whether or not Gribschaw had presented sufficient information to entitle himself to the mitigating factor of his intoxication. It was Difenderfer's belief that since the sole question to resolve was a legal question, the Trial Court rather than a jury would better handle it.

(Respt's Ex. 26, ECF No. 14-9 at pp.25-26, 35-36.) The Superior Court affirmed on appeal on the basis of Judge Cashman's Opinion, *see* FN 4, *supra*. (Resp't Ex. 30, ECF No. 15-5 at pp.37-42.)

Because the state courts rejected this claim on the merits, this Court must review it under AEDPA's standard of review, which is set forth at 28 U.S.C. § 2254, and set forth in section C, *supra*. The "clearly established Federal law" in which to analyze Petitioner's ineffective assistance claim is set forth in Strickland, *supra*, and the PCRA court applied this standard to Petitioner's ineffectiveness claims. *See* Resp't Ex. 26, ECF No. 14-9 at p.16 (citing Strickland and Commonwealth v. Pierce, 527 A.2d 973 (1987)).[7] Therefore, the state courts' adjudication

---

[7] The PCRA court recognized that the Strickland standards were adopted by the Pennsylvania Supreme Court in Pierce, which requires a defendant to prove a three-prong test. Although

of this claim, and the remaining ineffectiveness claims, was not "contrary to" <u>Strickland</u>. *See* <u>Werts,</u> 228 F.3d at 202-04 ("[A] state court decision that applied the Pennsylvania [ineffective assistance of counsel] test did not apply a rule of law that contradicted <u>Strickland</u> and thus was not 'contrary to' established Supreme Court precedent.").

The dispositive question, then, is whether the state courts' adjudication of Petitioner's ineffective assistance of counsel claims was an "unreasonable application" of <u>Strickland</u>. It was not. In order to overcome AEDPA's standard of review, Petitioner must show that the state courts' decision "cannot reasonably be justified under existing Supreme Court precedent[,]" <u>Hackett v. Price,</u> 381 F.3d 281, 287 (3d 2004), and he falls far short of meeting this burden.

Trial counsel's advice to his client to waive his right to a jury and proceed with a non-jury trial is a "classic example of strategic judgment" for which <u>Strickland</u> requires highly deferential judicial scrutiny. <u>Hatch v. State of Okla.,</u> 58 F.3d 1447, 1 459 (10th Cir. 1995) (quoting <u>Green v. Lynaugh,</u> 868 F.2d 176, 178 (5th Cir.), *cert. denied* 493 U.S. 831 (1989) (*per curiam*) (*overruled on other grounds by* <u>Daniels v. United States,</u> 254 F.3d 1180, 1188 n.1 (10th Cir. 2001), *cert. denied*, 517 U.S. 1235 (1996)). It "constitutes a conscious, tactical choice between two viable alternatives." <u>Carter v. Holt,</u> 817 F.2d 699, 701 (11th Cir. 1987). "For counsel's advice to rise to the level of constitutional ineffectiveness, the decision to waive a jury trial must have been completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." <u>Hatch,</u> 58 F.3d at 1459 (quoting <u>United States v. Ortiz Oliveras,</u> 717 F.2d 1, 4 (1st Cir. 1983)); *see also* <u>Carter,</u> 817 F.2d at 701 (stating that an ineffectiveness

---

Pennsylvania courts typically articulate a three-prong test for gauging ineffective assistance claims and <u>Strickland</u> sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. *See* <u>Werts,</u> 228 F.3d at 202–03.

claim based on counsel's decision to waive a jury is viable only if the choice was "so unreasonable that no competent attorney would have chosen it").

In this case, the PCRA court recounted the reasons why Attorney Difenderfer believed that proceeding with a non-jury trial would be in Petitioner's best interest. In sum, Attorney Difenderfer reasonably believed that, based on his experience before the court and the facts of the crime, it was a better strategy for Petitioner to waive his right to a jury trial. This Court need not expand upon the PCRA court's analysis as its adjudication of this claim easily satisfied AEDPA's standard of review. Petitioner's arguments to the contrary are clearly without merit and reveal nothing more than his dissatisfaction for proceeding to trial in the manner in which counsel advised and he voluntarily and knowingly chose. Moreover, circumstances are devoid of any evidence to show that a jury would have rendered a different outcome. Accordingly, this claim does not merit Petitioner with habeas relief.

### 3. Waiver of constitutional right to a jury trial was not knowingly, intelligently and voluntarily made due to trial counsel's failure to object to a defective oral colloquy.

Petitioner's third claim is that his waiver of his right to a jury trial was not knowing, intelligent or voluntary due to Attorney's Difenderfer's ineffectiveness in failing to object to a defective oral colloquy. Petitioner argues that he was never informed in the oral colloquy that the jury would be chosen from members of the community, which he claims is an "essential ingredient" of a jury trial and a requirement to a knowing, intelligent, and voluntary waiver, and that Attorney Difenderfer failed to object to the trial court's acceptance of a defective oral colloquy. (ECF No. 4 at p.35.)

Petitioner first raised this claim on direct appeal and it was addressed by Judge Cashman in his Pa. R.A.P. 1925(a) Opinion dated April 17, 2003 as follows:

Gribschaw's second contention of error is that he did not knowingly, intelligently, and voluntarily waive his right to a jury trial since there was an insufficient colloquy explaining to him the essential element of a jury trial, that being that the jury would be chosen from members of the community. Pennsylvania Rule of Criminal Procedure 620 sets forth the basis upon which an individual may waive his right to a jury trial as follows:

> Rule 620.  Waiver of Jury Trial
>
> In all cases, the defendant and the attorney for the Commonwealth may waive a jury trial with approval by a judge of the court in which the case is pending, and elect to have the judge try the case without a jury. The judge shall ascertain from the defendant whether this is a knowing and intelligent waiver, and such colloquy shall appear on the record.  The waiver shall be in writing, made a part of the record, and signed by the defendant, the attorney for the Commonwealth, the judge, and the defendant's attorney as a witness.

The Court is required to conduct an oral colloquy with the defendant to insure that he understands his right to a jury trial in addition to accepting and approving a written waiver of that right.  If the defendant is represented by counsel, that counsel must indicate that he has participated in the discussion and decision with respect to the waiver of that fundamental right and that the client understands the significance of this decision.

* * *

The constitutional right to a trial by jury as with other constitutional rights is not likely be deemed to be waived since it must be shown that such waiver is an intentional abandonment of that right.  *Commonwealth v. Garrett, 439 Pa. 58, 266 A.2d 82 (1970).*  It is the Commonwealth's burden to establish such a waiver since the right of trial by jury is fundamental to the accused.  *Johnson v. Zerbst, 304 U.S. 458, 58 S. Ct. 1019, 82 L.Ed. 1461 (1938).*

* * *

In making a determination as to whether or not the Commonwealth has met its burden in proving that the defendant's waiver of his right to a jury trial was freely, knowingly and voluntarily made, the totality of the circumstances analysis must be used to examine this question.  *Commonwealth v. DeGeorge, 506 Pa. 445, 485 A.2d 1089 (1984).*

When examining the record in light of this standard, it is clear that the Commonwealth met this burden.  Gribschaw executed a five page explanation of

rights form, entitled "Waiver of Jury Trial". The second question on that form reads as follows:

> "Do you understand that you will participate, along with your attorney, and the district attorney assigned to prosecute your case, in the **selection of that jury to be chosen from members of this community**, that being Allegheny County?" (Emphasis added.)

In response to this question, Gribschaw answered, "Yes." The following questions advised Gribschaw of the manner in which he would select jurors by the use of preemptory challenges and challenges for cause and that once his jury was selected, that any verdict that would be rendered, had to be unanimous, regardless of whether the verdict was guilty or not guilty. In response to the various questions that were asked in this form, Gribschaw indicated that he knew what his rights were and what rights he was waiving. This form specifically and unequivocally advised Gribschaw of the fact that the jury that was to be selected in this case was to be a jury selected of his peers, those being individuals from the community in which he resided, that being Allegheny County. Gribschaw signed this form and it was also signed by his trial counsel.

In addition to this written colloquy, pursuant to Pennsylvania Rule of Criminal Procedure 620, this Court conducted an extensive oral colloquy inquiring as to whether or not Gribschaw understood his right to a jury trial, the manner in which he would select a jury, the fact that the jury's verdict had to be unanimous, regardless of whatever that verdict was, and the significance of his waiver of that right. This oral colloquy is as follows:

> THE CLERK: Now is the time set for the manner of the Commonwealth versus David Gribschaw.
>
> Mr. Gribschaw, would you come forward with your counsel please.
>
> (Defendant sworn.)
>
> THE COURT: Mr. Gribschaw, I see that you are 21 years old, sir.
>
> THE DEFENDANT: Yes.
>
> THE COURT: How far did you go in school?
>
> THE DEFENDANT: One year of college.

THE COURT: So we can presume that you can read, write and understand the English language.

THE DEFENDANT: Yes.

THE COURT: Did you have any difficulty understanding any of the questions asked of you in this five page explanation of rights form?

THE DEFENDANT: No, sir.

THE COURT: Do you understand at CC 200002746, you are charged generally with the crime of criminal homicide.

Criminal homicide has various degrees. Those degrees being first degree murder. First degree murder carries with it a sentence of life imprisonment. Second degree murder is a felony murder. That also carries with it a sentence of life imprisonment. Third degree murder carries with it a maximum period of incarceration of not less than 20 nor more than 40 years. Voluntary manslaughter carries with it a maximum penalty of a period of incarceration of not less than ten nor more than 20 years. And involuntary manslaughter carries with it a maximum penalty of a period of incarceration of not less than two and a half nor more than five years.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Since you have been charged with the crime of criminal homicide generally, you would be entitled to seven peremptory challenges.

A peremptory challenge is a challenge that you can use for any reason whatsoever to remove somebody from the jury panel and you would not have to explain that reason to anyone.

You would also be entitled to unlimited challenges for cause, and that's where it would appear that an individual could not serve as a fair and impartial juror on your case.

The Commonwealth would have the same right to peremptory challenges and challenges for cause that you would in the formulation of any jury panel.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT: Had you proceeded with a jury trial, you would have selected 14 individuals, 12 of whom ultimately would have rendered the verdicts in this case.  That verdict would have to be unanimous regardless of whether that verdict was guilty or not guilty.

If the jury was unable to reach a unanimous verdict, we would declare the jury to be a hung jury.  As such, that jury would be dismissed and you would have to be retried on this charge within 120 days if you were in jail or 365 days if you were out on bail from the date that it was determined that the jury was a hung jury or the charge against you might be dismissed.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT: Have you had a full and ample opportunity to discuss with Mr. Difenderfer the manner in which you should try this case?

THE DEFENDANT:  Yes.

THE COURT: Do you understand that while he may give you advice, he may not make this decision for you?

THE DEFENDANT:  Yes.

THE COURT: Is this a free and voluntary decision on your part to waive your right to a jury trial.

THE DEFENDANT:  Yes.

THE COURT: Has anybody forced, threatened or coerced you into doing so?

THE DEFENDANT: No.

THE COURT: Have you had any drugs or alcohol in the past 48 hours?

THE DEFENDANT: No.

THE COURT: Are you taking any prescriptive medication?

THE DEFENDANT: No.

THE COURT: Are you suffering from any mental illness or disability that would affect your ability to make this decision?

THE DEFENDANT: No.

Non-Jury Trial Transcript, page 6, line 5 through page 10, line 1.

* * *

. . . . By virtue of the execution of his written colloquy and his responses to the oral colloquy conducted by this Court, Gribschaw acknowledged that he freely and voluntarily waived his right to a jury trial and he understood the necessary elements to effectively, knowingly and intelligently waive that right to a jury trial.

(Resp't Ex. 10, ECF No. 13-3 at pp.23-27.)  Petitioner also presented this claim in his PCRA petition and Judge Cashman addressed it in identical language.  (Resp't Ex. 26, ECF No. 14-9 at pp.28-35.)  The Superior Court affirmed on appeal on the basis of Judge Cashman's Opinion, *see* FN 4, *supra*.  (Resp't Ex. 30, ECF No. 15-5 at pp.37-42.)

The right to a jury is fundamental.  Duncan v. Louisiana, 391 U.S. 145, 149 (1968). "Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences." Brady v. United States, 397 U.S. 742, 748 (1970).  "Whether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case."  Adams v. United States ex rel. McCann, 317 U.S. 269, 278 (1942).

In Commonwealth v. O'Donnell, 740 A.2d 198 (1999), the Pennsylvania Supreme Court

stated that

> [a] voluntary waiver of a trial by jury will be found to be knowing and intelligent
> when an on-record colloquy indicates that the defendant knew the essential
> ingredients of a jury trial, which are necessary to understand the significance of
> the right being waived. Commonwealth v. Williams, 454 Pa. 368, 373, 312 A.2d
> 597, 600 (1973). These essential ingredients are the requirements that the jury be
> chosen from members of the community (a jury of one's peers), that the verdict
> be unanimous, and that the accused be allowed to participate in the selection of
> the jury panel. Id.

O'Donnell, 740 A.2d at 212. *See also* Commonwealth v. Morin, 383 A.2d 832, 834 (1978).

While Pennsylvania requires an on-the-record colloquy prior to the jury trial waiver, Pa. R. Crim.

P. 620, there is no such federal constitutional requirement, United States v. Lilly, 536 F.3d 190,

194 (3d Cir. 2008).[8]  Instead, all that is required to waive the right to a jury trial is the

defendant's "express and intelligent consent," and the agreement of both the government and the

court. Singer v. United States, 380 U.S. 24, 34 (1965) (citing Adams, 317 U.S. at 277-78);

Patton v. United States, 281 U.S. 276 (1930). Therefore, in this case, even assuming the

colloquy was insufficient under Pennsylvania law, Petitioner is not entitled to habeas relief

because "federal habeas corpus relief does not lie for errors of state law." Estelle v. McGuire,

502 U.S. at 67 (quoting Lewis v. Jeffers, 497 U.S. 764, 780 (1990)).

Given the absence of United States Supreme Court precedent requiring an on-the-record

colloquy when a defendant chooses to waive his right to a jury trial, the state court's denial of

---

[8] However, in the Third Circuit, such a colloquy is required and, at a minimum, the trial court
should inform the defendant that: (1) the jury would be composed of twelve members of the
community, (2) he may participate in the selection of the jurors, (3) the verdict of the jury must
be unanimous, and (4) the judge alone will decide his guilt, if he waives his jury trial right.
Lilly, 536 F.3d at 198 (quoting United States v. Martin, 704 F.2d 267, 274-75 (6th Cir. 1983)).

this claim cannot be said to be contrary to, or an unreasonable application of, clearly established Federal law under § 2254(d)(1).

In addition, the state court's conclusion that Petitioner freely and voluntarily waived his right to a jury trial and that he understood the necessary elements to effectively, knowingly and intelligently waive that right, was not based on an unreasonable determination of the facts. In this case, the trial court conducted an extensive on-the-record colloquy with respect to the waiver of the right to a jury trial and Petitioner signed an express waiver of that right, which was also signed by trial counsel and specifically informed him of the fact that a jury would be selected from members of the community. There is no basis to conclude that Petitioner did not comprehend his rights after the colloquy or knowingly, intelligently and voluntarily waive his right to a jury trial. Furthermore, trial counsel did not render ineffective assistance because there is nothing to suggest that Petitioner would not have waived his right had trial counsel objected to the alleged defective colloquy. As such, this Court finds that the state court decision denying this claim was based on reasonable factual determinations in light of the evidence before them and does not entitle Petitioner to habeas relief.

4. **Trial counsel was ineffective in failing to object to at trial and/or raise in post-sentence motions that the trial court committed error in using and considering evidence outside of the record.**

Petitioner claims that Attorney Difenderfer was ineffective for failing to object at trial or raise post trial that the trial court went outside the evidence adduced at trial.

Judge Cashman addressed this claim in his August 21, 2008 Pa. R.A.P. 1925(a) Opinion as follows:

> Gribschaw's final contention of error is that his trial counsel was ineffective for failing to file a motion seeking a new trial on the basis that this Court acquired information about the psychological, physiological and

35

pharmacological effects of ketamine outside of the record. This contention apparently is predicated upon an off-hand remark made by this Court to Difenderfer during his closing argument. In particular, Difenderfer indicated that although he had trial numerous drug cases, Gribschaw's case was the first case that he had that involved the drug ketamine. In response to that statement, this Court stated: "Go on the Internet and you'll find out all about it." Trial Transcript, page 344, lines 22-23. This Court decided Gribschaw's case based upon the record it had before it and not by any search on the Internet. The statement that was made in response to Difenderfer's statement that he had never had a case involving ketamine, was only an acknowledgment of the value of searching the Internet as a resource tool. Difenderfer echoed that statement since he said he had used the Internet resources to search for additional information about ketamine. As with all of Gribschaw's other arguments in his petition for post-conviction relief, this contention is clearly without merit.

(Resp't Ex. 26, ECF No. 14-9 at pp.37-38.) The Superior Court affirmed on appeal on the basis of Judge Cashman's Opinion, *see* FN 4, *supra*, (Resp't Ex. 30, ECF No. 15-5 at pp.37-42), but the Superior Court further stated that

> [w]ith regard to Appellant's final argument concerning the trial court's alleged reliance upon evidence not adduced at trial when rendering its verdict, we note that the exchange Appellant quotes in his brief does not "make[] clear that the [t]rial [c]ourt, on the eve of trial and judgment, used and considered evidence not adduced at trial to assist in reaching its verdict." See Brief for Appellant at 39. To the contrary, the trial court's initial statement, as it explains in its Opinion, merely apprised Appellant's counsel of the value of the internet as a research tool. Appellant interprets the trial court's statement thereafter that it had been connected to the internet the prior evening while in bed to mean that it was researching the affect of Ketamine upon Appellant's mental faculties. Id. at 39-40. Our review of the statement revealed that the trial court did not indicate what, if anything, it had been researching the prior evening, but rather its words constitute a commentary upon the advantages of owning a notebook computer.

(Resp't Ex. 30, ECF No. 15-5 at p.42 n.3).

Petitioner argues that the trial court's comment, viewed in the context in which it was given, makes clear that the trial court, on the eve of trial and judgment, used and considered evidence not adduced at trial to assist in reaching its verdict. He states that there was no useful purpose for the trial court to utter the statement other than to apprise Attorney Difenderfer, as

well as ADA Fitzsimmons, of the fact that it has used the internet for the specific reason of gaining knowledge regarding Ketamine and its capabilities, which was the critical issue in the case.  He argues that Attorney Difenderfer's failure to object to the comment, or request an elaboration, or preserve the issue for appellate review in a post-sentence motion, denied him his constitutional right to an impartial factfinder.  (ECF No. 4 at pp.38-40.)

Again, the dipositive question is whether the state courts' adjudication of Petitioner's ineffective assistance of counsel claims was an "unreasonable application" of Strickland.  It was not.  In order to overcome AEDPA's standard of review, Petitioner must show that the state courts' decision "cannot reasonably be justified under existing Supreme Court precedent[,]" Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004), and he does not meet this burden.

Even assuming the fact that the trial court engaged in internet research on the eve of trial and judgment, although there is no evidence that in fact happened, Petitioner has not explained how he was prejudiced by such research and how it rendered his trial proceedings so fundamentally unfair as to violate due process.  *See* Sikat v. Kate, C.A. No. 11-1035, 2015 WL 1321881, at *10 (C.D. Cal. Mar. 20, 2015) (trial judge's online research of crime prior to sentencing, including pubic outcry, did not render petitioner's trial fundamentally unfair).  He does not point to any specific research that may have been found online about the affects of Ketamine and how that research may have had an impact on or influenced the judge's verdict. Additionally, he has not demonstrated that the trial judge actually considered any evidence outside the record prior to rendering his verdict; again, even assuming such research was conducted.  In light of Petitioner's failure to demonstrate prejudice, it was not unreasonable for the state court to determinate that counsel was not ineffective.  Consequently, Petitioner is not entitled to habeas relief on this claim.

**5. Trial counsel was ineffective in failing to adequately prepare for trial and/or in failing to adequately prepare Petitioner for trial.**

In this claim, Petitioner asserts that Attorney Difenderfer did not gain the necessary information to adequately prepare for trial and/or did not discuss the essential legal and factual aspects to adequately prepare Petitioner for trial. In addressing this claim in his August 21, 2008 Pa. R.A.P. 1925(a) Opinion, Judge Cashman found as follows:

> The fact that his trial counsel met with him only twice in the Allegheny County Jail does not demonstrate that his trial counsel was unprepared to try this case. Gribschaw's case was not a difficult case factually to try. There was no dispute that Gribschaw killed Carter. There was no dispute that Gribschaw disposed of the body. There was no dispute as to the manner in which Gribschaw went about causing Carter's death by bludgeoning him with a baseball bat and by strangling him with a string. The only issue that was in dispute was whether or not Gribschaw had the necessary mental faculties to form the specific intent to kill. In that regard, Gribschaw's counsel testified that he met numerous times with Gribschaw and that he met numerous times with Gribschaw's parents in discussing his views as to the manner in which this case should be tried and the thrust of the argument with respect to Gribschaw's inability to form the specific intent to kill.

(Resp't Ex. 26, ECF No. 14-9 at p.25.) The Superior Court affirmed on appeal on the basis of Judge Cashman's Opinion, *see* FN 4, *supra*. (Resp't Ex. 30, ECF No. 15-5 at pp.37-42.)

Once again, the dipositive question is whether the state courts' adjudication of Petitioner's ineffective assistance of counsel claims was an "unreasonable application" of Strickland. It was not. In order to overcome AEDPA's standard of review, Petitioner must show that the state courts' decision "cannot reasonably be justified under existing Supreme Court precedent[,]" Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004), and he falls far short of meeting this burden.

In this case, Petitioner has failed to provide any explanation of how counsel was not prepared, what should have been done and was not done because he was unprepared, and how it

would have made a difference in the outcome of his trial. A petitioner's "[b]ald assertion that counsel should have conducted more thorough pretrial investigation fails to overcome the presumption that counsel acted reasonably." Matura v. United States, 875 F. Supp. 235, 237 (S.D.N.Y. 1995) (citing Strickland, 466 U.S. at 639). Attorneys have wide discretion in deciding how they will investigate a case. Id. Counsel has a duty only "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. In the instant action, Petitioner has failed to demonstrate that his trial counsel's representation fell below "the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688. More importantly, he has failed to show that the state courts' determination in this regard is contrary to or an unreasonable application of Supreme Court law. Consequently, he has not demonstrated that he is entitled to relief on this claim.

**6. <u>Trial judge violated Petitioner's right to due process.</u>**

In this claim, Petitioner claims that he was improperly sentenced under 42 Pa. C.S.A. § 9715, rather than 42 Pa. C.S.A. § 9711, that the trial court lacked statutory authority to resentence him, and that his new sentence is an illegal sentence.

First, the state court did not resentence Petitioner; it did not change Petitioner's sentence. Instead, it corrected a citation error in the original Sentencing Order, which, according to the trial court, it was authorized to do under state law. Such allegations, even if couched in the language of due process, do not rise to the level of a constitutional error. *See* In re Martin, 398 F. App'x 326 (10th Cir. 2010).

Moreover, these allegations do not raise a claim that is cognizable in federal habeas proceedings. The general rule in federal habeas proceedings is that "a federal court will not reevaluate a sentence in a habeas corpus proceeding unless it exceeds statutory limits." Milton v.

Graterford, C.A. No. 1:09-CV-1477, 2010 WL 5060199, at *1 (M.D. Pa. Dec. 6, 2010) (citing

Jones v. Superintendent of Rahway State Prison, 725 F.2d 40, 42-43 (3d Cir.1984)); *see*

Coleman v. Folino, C.A. No. 09-1225, 2010 WL 2683151, at *9 (W.D. Pa. June 1, 2010)

(finding that "[g]enerally, sentencing is a matter of state criminal procedure and does not fall

within the purview of federal habeas corpus" and "a federal court will not normally review a

state sentencing determination that falls within the statutory limit"), *adopted by*, 2010 WL

2653351 (W.D. Pa. July 2, 2010); DeSavage v. Lawler, C.A. No. 08-92, 2010 WL 411754, at

*10 (W.D. Pa. Jan 28, 2010) (same). Petitioner has not alleged that the sentence he received was

beyond the statutory maximum, nor has he alleged anything that would take this case outside of

the general rule that sentencing is generally a matter of state criminal procedure, which does not

fall under the scope of federal habeas review. This claim amounts to no more than a

disagreement with the state court's resolution of a state law problem.

In this claim, Petitioner also asserts a violation of Alleyne v. United States, 133 S. Ct.

2151 (2013), in which the United States Supreme Court held that any fact that triggers an

increase in the mandatory minimum sentence for a crime is necessarily an element of the offense

which must be submitted to a jury. However, Alleyne is inapplicable to Petitioner's case

because the mandatory sentence for his conviction was life in prison without the possibility of

parole and there were no additional facts over and above that which was necessary to sustain the

conviction that increased that penalty. Accordingly, these claims are denied.

## 7. Trial court lacked subject matter jurisdiction to prosecute, convict and sentence Petitioner.

Petitioner claims that he was denied due process because the criminal complaint charging

him with criminal homicide was invalid, void and unconstitutional in that it did not conform to

Pa. R. Crim. P. 504. Specifically, he claims that the criminal complaint did not contain: (1) the signature of the affiant; (2) the signature of the issuing authority; (3) the seal from the Allegheny County Coroner's Office; (4) an incident, UER or OTN number; (5) title for the section of the statute violated; and (6) the place where the crime was committed. He also states that the criminal complaint is an unlawful citation violating 1 Pa. C.S. § 102.

First, the criminal complaint requirements are governed by state law and procedures and are therefore not subject to federal habeas review. Estelle, 502 U.S. at 67-68. Nevertheless, Petitioner is incorrect. The criminal complaint contains all the contents that are required by Pa. R. Crim. P. 504, including the signature of the affiant, the signature of the issuing authority, an incident and OTN number and the place where the crime was committed. The title for the section of the statute violated, 18 Pa. C.S.A. § 2501, Criminal Homicide, is not required but is also included in the criminal complaint, and the seal of the Allegheny County Coroner's Office is not a requirement.

Petitioner next argues that the Criminal Homicide statute, 18 Pa. C.S.A. § 2501, is just a procedural statute and carries with it no punishment. This claim is simply without merit. Pennsylvania's sentencing procedure for murder of the first degree, 42 Pa. C.S.A. § 9711, in combination with 18 Pa. C.S.A. § 1102 and 42 Pa. C.S.A. § 9756, provides the authority under which a sentence of life imprisonment shall be imposed on one who has been convicted of first degree murder.

Petitioner also asserts a violation of the Fifth Amendment of the United States Constitution because he was not indicted by a grand jury. However, the requirement of a grand jury indictment under the Fifth Amendment has not been extended to the states through the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Alexander v.

41

Louisiana, 405 U.S. 625, 633 (1972) ("[T]he [Supreme] Court has never held that federal concepts of a 'grand jury,' . . . are obligatory for the States.") (citing Hurtado v. California, 110 U.S. 516, 538 (1884)).

Petitioner is not entitled to relief on any of these claims.

8. **Petitioner is actually innocent because he did not possess the neurological capacity for the state of mind required to formulate premeditation and deliberation.**

Petitioner's final claim is based on the recent Supreme Court case of Miller v. Alabama, 132 S. Ct. 2455 (2012). In Miller, the Supreme Court clearly established a new constitutional right by holding that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." 132 S. Ct. at 2469. Shortly thereafter, the Supreme Court issued Montgomery v. Louisiana, 136 S. Ct. 718 (2016), holding that Miller applies retroactively. 136 S. Ct. at 735-56.

Despite Petitioner's argument that the underlying science relied upon by the Supreme Court applies equally to non-juveniles, the Supreme Court did not extend its rationale or holding beyond application to juveniles, and by its plain language the Court excluded application of its holding to individuals who are eighteen or above at the time their crime was committed. Based upon the plain language employed by the Supreme Court in Miller, no new constitutional right was created that would be applicable to Petitioner, who was nineteen (19) years of age at the time of his crime.

In Petitioner's final Supplement, (ECF No. 68), filed March 22, 2016, he argues that he is "actually innocent" of first-degree murder (and second-degree murder) because he was incapable of forming premeditation and deliberation. In support of this claim, he relies on the Supreme

Court's reasoning in <u>Miller v. Alabama</u>, *supra*, <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002),[9] and

<u>Roper v. Simmons</u>, 543 U.S. 551 (2005).[10]

First, this claim is unexhausted because Petitioner did not present it to the state courts.

*See* O'Sullivan v. Boerckel, 526 U.S. 838 (1999) (a petitioner must present every claim raised in

the federal petition to the state's trial court, intermediate appellate court and highest court before

exhaustion will be considered satisfied). Furthermore, any attempt to go back and raise the claim

in a subsequent post-conviction petition would be futile because such petition would be time-

barred by the statute of limitations contained in the current version of Pennsylvania's PCRA

statute, 42 Pa.C.S.A. § 9545(b). Thus, the claim is procedurally defaulted and barred from

habeas review unless Petitioner can establish "cause" for the default and "prejudice" attributable

thereto, or a fundamental miscarriage of justice. *See* Coleman v. Thompson, 501 U.S. 722, 750

(1991). In this matter, Petitioner has failed to plead, let alone prove, "cause" and "prejudice" to

overcome the procedural default.[11] Likewise, Petitioner has failed to plead and establish a

fundamental miscarriage of justice.[12] Therefore, the claim must be dismissed.

---

[9] <u>Atkins</u> held that executing people with intellectual disabilities violates the Eighth Amendment's ban on cruel and unusual punishments, but states can define who has intellectual disability.

[10] <u>Roper</u> held that it is unconstitutional to impose capital punishment for crimes committed while under the age of 18.

[11] To satisfy the cause standard, a petitioner must demonstrate that some objective factor external to the defense impeded his or her efforts to raise the claim in state court. McCleskey v. Zant, 499 U.S. 467, 493 (1991); Murray v. Carrier, 477 U.S. 478, 488 (1986). To show prejudice, a petitioner must demonstrate that the error worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions, not merely that the error created a "possibility of prejudice." Carrier, 477 U.S. at 494.

[12] Where a petitioner cannot make a showing of "cause and prejudice," a federal court may nevertheless consider the merits of his or her unexhausted claims under circumstances in which the failure to adjudicate such claims would result in a "fundamental miscarriage of justice."

Nevertheless, this claim does not merit Petitioner with relief. Petitioner asks this Court to extend the reasoning of Miller, Atkins and Roper to individuals younger than twenty-five because science has proven that human brains do not mature to adulthood before the age of twenty-five. However, the United States Supreme Court drew a bright line at eighteen years of age. *See* Roper, 543 U.S. at 574 ("[t]his age of 18 is the point where society draws the line for many purposes between childhood and adulthood."). It does not matter that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." Id. at 569. Despite Petitioner's arguments and any scientific evidence to the contrary, the Supreme Court has drawn a hard line at eighteen for purposes of adulthood and there is absolutely no binding legal authority finding that individuals who were eighteen and over at the time they committed their crimes are incapable of forming premeditation and deliberation to commit murder.

## F.     Certificate of Appealability

AEDPA codified standards governing the issuance of a certificate of appealability for appellate review of a district court's disposition of a habeas petition. As provided for in 28 U.S.C. § 2253, "[a] certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (citing Slack v. McDaniel, 529 U.S. 473, 484 (2000)). "When the district

---

Coleman, 501 U.S. at 750. This exception to the procedural default doctrine is based on the principle that, in certain circumstances, "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" Carrier, 477 U.S. at 495 (quoting Engle v. Isaac, 456 U.S. 107, 135 (1982)).

court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a [certificate of appealability] should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." Slack v. McDaniel, 529 U.S. 473, 484 (2000). Petitioner has not made the requisite showing in these circumstances. Accordingly, a certificate of appealability will be denied. A separate order will issue.

Dated: March 23, 2016

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Cc: David Patrick Gribschaw
    EV 9574
    SCI Somerset
    1600 Walters Mill Road
    Somerset, PA 15510